Good afternoon, Your Honors. May I please have the floor? My name is Henry Josephsburg, and I'm representing the appellant, Mr. Hobbs. I would just like to point out that I have Mr. Hobbs at counsel table along with Lisa Miller, who was on the briefs with me. If I may, I'd like to reserve half my time for rebuttal. I think after rereading through all the briefs and looking at the cases involved, the thing that I think I'd like to emphasize, although not really the crucial point in the case, deals with the confidentiality issue, which I'm sure you have read is a very important issue. Counsel, I'd actually like to start, if you don't mind, with the question of favorable termination of the previous criminal proceeding. In looking at whether a state conviction has been favorably terminated, is that a question of state law as to what constitutes in that state a favorable termination sufficient to support a malicious prosecution claim? I think the answer is probably, and the reason I hedge it that way is because in heck, the Supreme Court told us that the state common law is not necessarily dispositive of a 1983 malicious prosecution case. However, to be a little more direct about it, the authorities, both state and federal, seem to concur on the issue that where the conviction has been reversed on the merits, and I can demonstrate that the conviction was obtained through fraud, perjury, that sort of thing, that that would be a favorable termination based on that court of appeal decision. The cases seem to suggest that a favorable termination, that it isn't enough to have an appellate court say, let's have a do-over, and the prosecutor decides not to have a do-over, if there was sufficient evidence. We're not talking about a case that's reversed as distinct from a new trial opportunity. What about the reversal in this case would indicate innocence as distinct from an opportunity for a do-over that wasn't taken for discretionary reasons? Of course. Well, the state court of appeal did reverse. It did not remand, first of all. It did so because of a trial error, not because it said that he was innocent. Correct? Well, it did so because of a trial error and because he was innocent. I think the analysis that the city has been promoting all along. Where in Hobbs I do you see that? Hobbs I had to do with the people's appeal. Okay. I'm sorry. In Hobbs I and II. And Hobbs II, the court of appeal talked about the impossibility under the circumstances of demonstrating that these particular documents could be a predicate for a felony conviction. Now, to be sure, in Hobbs I we see the obvious that, yes, Mr. Hobbs did use some sheets of paper that were city property, but at the most that could be an infraction. The paper itself has no value. Well, nominal. Its use had megabucks value. Maybe yes, maybe no. It depends on how you look at it. Not to be diverted by that, just to go back to the original question about Hobbs II. The court of appeal framed its holding in the apparent alternative. Yes. Point exactly to the language that you're relying upon. If I may, retrieval brief. Because it seems to me that under contentions of the parties, the defendant is challenging three instructions. The trial court erred in giving the first instruction, and the error was not harmless. And that's its holding. It, to me, seems to say nothing about guilt or innocence. In Hobbs II at star 20, which you'll find in the record at 411, the court says, even assuming that all the information was received in confidence. So the court of appeal doesn't make a determination as to confidentiality one way or the other. Assuming all the information was received in confidence, the prosecution did not establish that disclosure of the information would result in unfair competitive disadvantage. Indeed, it is difficult to see where disclosure of certain individuals' cell phone bills would have that result. The only fair reading of this is that the court is saying, yes, the trial judge misinstructed the jury, but in addition to that, we're finding that there could not be a conviction. Well, I read that quite differently. I read that to say that it's not harmless error because it's not established conclusively that a proper instruction would have led to the same result. I don't read it as saying that the evidence was insufficient. Well, certainly that is part of a harmless error analysis because without that, even if the jury were instructed improperly, there would have been an affirmance. However, the mere fact that it supports prejudicial error does not mean that it's not part of the holding of the case, and the court of appeal is saying you're not going to get a conviction on these facts. You cannot show with the evidence that you've presented that Mr. Hobbs is guilty of the felony that he was charged with. You just can't show it. I'm sorry. I'm having the same trouble as Judge Graber. If you go on to the end where they talk about a properly instructed jury could certainly have determined that the documents in Exhibit 3 were not exempt under the PRA, a conclusion that when combined with the defendant's evidence that his appropriation of the documents was open and avowed could have established his claim of right defense. This whole discussion is harmlessness, and it's saying it wasn't harmless.  I think that passage refers to Mr. Hobbs' defense of a good faith but erroneous belief. Ad omnisio, the prosecution must demonstrate a level of confidentiality in these documents to obtain a felony conviction. Without confidentiality, these documents have no particular validity. Where was it established that they weren't confidential, that none of them was confidential? I thought that's what his defense was, well, that they were all available to the public. It couldn't have been confidential because they met the criteria. That's not a determination that Mr. Hobbs ever sought. He didn't purport to make any application to use these documents under the PRA. It's his defense. Basically, it says that was his judgment that it was, but I don't read Hobbs, too, as ever saying that he was absolutely right. It does not say he was absolutely right. I will concede that point. Okay. However, in coming to the conclusions that it did, Hobbs, too, made very plain that confidentiality could not be established. Mr. Hobbs did indeed use a confidentiality issue as a defense, but in the grand jury, in the trials, the prosecution necessarily had to prove confidentiality in order to get a felony conviction. Counsel, I have a question, then, about the probable cause piece of this. In Hobbs I, which was where I got mixed up earlier because I have a question about Hobbs I also, the Hobbs I court held that the evidence was sufficient to support a charge of embezzlement by a public officer and that probable cause sufficiently appears. Absolutely. And the court wasn't happy with it. It sort of said, gosh, maybe this isn't the right solution, but there's probable cause. Why isn't that the law of the case to establish probable cause? Two reasons. First, what Hobbs I was talking about was the misdemeanor. They're talking about the sheets of paper. They were not talking about the value added by confidentiality. The second reason is that in establishing probable cause at that level in the court of appeal, we look then to Hobbs II, which disagrees. It doesn't. Hobbs II isn't about probable cause. I'm sorry? Hobbs II is not about probable cause. No. Hobbs I is formally speaking about probable cause. And the fact of a reversal does not, particularly for instructional error, does not negate probable cause. I mean, you have murder defendants who are then convicted on retrial. No, it doesn't mean there's no probable cause. Understood. The probable cause Hobbs I finds is not a felony probable cause. It's only finding probable cause for those pieces of paper. That's why the court was so troubled by it. It adverted back to an older case that had exactly the same trouble on exactly the same problem. Some guy uses the copying machine, or maybe the older case was old enough to be mimeos, but that's all it was. It had no intrinsic value. And that was the trouble that Hobbs I was reflecting. But in a malicious prosecution case, it's the charge that succeeded and that was at issue that is always the subject of the cause of action. If there was some other crime that he was convicted of, it doesn't matter. So is your argument, just so I can understand this, is your argument that even if the supervisors who thought Mr. Hobbs had violated the policy of not releasing audit documents, if they, in good faith, thought they were confidential and the prosecutor believed that they were confidential and they brought the charge on confidentiality, that that didn't establish probable cause because they didn't have any value if they couldn't establish that they were in fact confidential? For the felony charge. So they had to prove the value of the documents to establish, to validate probable cause? Is that what you're saying? That is one of the things, yes, Your Honor, because without a $400 value under state law, it couldn't be a felony. And that's what Hobbs 1 is dealing with. So is it your view that value is looked at by the actual physical value of the piece of paper? This is a piece of paper and so you can probably get it for half a cent? For the misdemeanor. Or is it, well, for the felony, which is what we're talking about. So is value evaluated by the use value of this? If I held the lottery numbers for sure here that would get you $2 million, is this worth $2 million or half a cent? $2 million, without a doubt. Paper, of course, in our society has value by the information contained in it. The only value contained in these particular pieces of paper could derive only from their being confidential. Well, let's put it this way. Mr. Hobbs, let's posit that he got access to documents before anybody else could get access to documents. And he used the documents that he acquired in a position of trust as an auditor. And he appropriated those not generally available at the time documents. And he used them to file a lawsuit in which, if he succeeded, he would realize 25% of any damages. He has had access to documents that no other lawyer had who could have filed the same suit had he had those documents. So why doesn't that suggest that the documents do have value? They have value as evidentiary materials, as foundation for a lawsuit, and the use to which those documents are put. Now, why wouldn't that be the value and essentially in conformity with the facts of this case? I mean, that's how they were used. That is indeed how they were used. And at no point during the trial was that ever attributed to be the value of the documents. Instead, the city prepared an audit of $42,000 that it cost the city $42,000 to get these documents, which was not possible. That was the value that was attributed to those documents. And the value was probably a whole lot greater than that because it would have been 25% of the potential. To Mr. Hobbs. To Mr. Hobbs and his clients, yes. But not as a document that would have value for the purpose of imposing felony liability on taking those pieces of paper. We've used up all of your time with questions, but we will give you a couple minutes for rebuttal on the topic. Very generous. Thank you so much, Your Honor. Good afternoon, Your Honors, the police and court. There are some specific questions you may have for me, or would you like me to address them? Why don't you start in, and as we think of questions, we'll ask them. Well, I will address a couple of the issues. You could respond to counsel's argument if nothing else. Very well. That's what I was going to do. With regards to the probable cause question, clearly the appellant here had the opportunity to fight the probable cause determination through that motion under Penal Code 955 in Hobbs 1. And, in fact, I think it's 955B that says it should be dismissed if there's no probable cause. The court, in fact, found that there was probable cause to bind him over for the hearing. And I think based on the Plumlee case and the State of California law, I think that's conclusive evidence that, in fact, probable cause was met. And, again, it's important to you. Counsel, was the probable cause issue addressed in the Court of Appeal? It was addressed in the Court of Appeal. They didn't speak to the 955 motions, whether or not it was good or bad, whether it was proper or not proper. It just mentioned that and talked about the fact that it was brought up and the court did find that there was probable cause. Did the Court of Appeal find that there was probable cause? I believe it did because it wasn't changed and the matter was allowed to be retried. In addition to that, I think it's important to note that, under California law, we're not looking for probable cause to equal conviction. Probable cause is a very low standard. And what we're looking at is something that puts a situation where, hey, there's the likelihood or the possibility that there could be a conviction. But you don't have to guarantee a conviction for there to be probable cause. It's a lower burden. Let's see here. So let's see. Hobbs 1, and that was at 793. And with regards to the reversal in Hobbs 2, clearly I think I'm agreeing with the Court in the fact that that case was reversed based on the instruction whereby the trial court said, as a matter of law, there was an exemption, and the appellate court said, no, that should be something left to the jury to determine one way or the other. It had nothing to do with the other issues that were brought up. Let's see here. With regards to the value, again, I agree with the court's interpretation. While a single piece of paper may be worth a penny or a half cent, what we have here is a situation where the appellant, Mr. Hobbs, was in charge of this audit of the telephone companies. He was in charge of the auditors under him working on that audit. And what Mr. Suarez had done was kind of did a spreadsheet that said, well, I wasn't directly supervising him. I don't know exactly how all these hours were met, but minimally the audit itself cost the city about $42,000. Part and parcel of that audit is all the information gleaned from the audit with regards to what was going on with the telephone companies, as well as the documentation that was subsequently used. Was there evidence of the use to which Mr. Hobbs put this information? That is, was there evidence that he had made these attorney fee claims and the class action and so forth? Yes. And if so, did it have the possibility of allowing a jury to infer the amount of value to him that the information had? I don't know at the trial level whether or not there was a determination made with regards to how much the value of the information was. What we do know is that the information was, in fact, used in the Sanchez complaints, both the original and the amended complaint, and there were specific paragraphs of letters lifted from the letters and placed into the complaint as part of the allegation. So we do know that the information was used. Clearly this was a law. If those excerpted letters were established at trial to have been non-confidential, that they were simply communications that anybody from the public could have had access to, how would that affect the analysis? Well, I think under the facts and circumstances of this case, while if down the line those documents were found to be discoverable through a public records request or something like that, that would be fine. But you can't go back and argue when you're under the course and scope of your work with the city as an auditor where no one has this information and you use it for your own personal gain with reference to the lawsuit and the attorney's fees. You can't say, well, maybe a year down the line it will be all well and good in its public records. But at the time and place that it was used, clearly no one else had access to it. It's the city's position that it was, in fact, confidential. And clearly it was for Mr. Hobbs' financial gain. Well, I wasn't sure I was following. You said that the $42,000 was based on a spreadsheet that Mr. Stubbs put together, is that right? Mr. Squires. Mr. Squires put together. And did that calculate any value of the information or to say this is what it cost us in person power to obtain them and process them and analyze them? The spreadsheet itself was an itemization of employees who worked on the audits under Mr. Hobbs as well as their hours spent, and then there was a multiplication of what their hourly rates are. So the answer is the cost analysis. It wasn't a value analysis. Correct. Unfortunately, it's impossible for the city to make, say, this particular paper and the knowledge on this paper is worth $7 or $400. What it could say is that sort of the mirror image perhaps of analyzing its worth to Mr. Hobbs, it would also, to the extent that they were valuable to the city in recovering the underpayments, it would be the same thing. In other words, they had value as evidence. Agreed, and you make a good point, Your Honor, because what happened was as a result of the filing of the Sanchez lawsuit, as the briefs indicated, there was a consortium of over 100 cities throughout the state trying to deal with this issue. And with regards to the city itself, I believe there was somewhere between $6 and $7 million at stake that they were dealing with with regards to the resolution of the utility tax. So to the city, it had value. It also had value to its reputation because we were put into a position where we're working with the city of Los Angeles, and now one of our auditors has filed a lawsuit against the city, which causes a problem. And it's a similar argument with regards to the value as to the appellant, Mr. Hobbs, because to him that information was worth possibly millions of dollars. So clearly it exceeds the $400 value. I have another question going to confidentiality. The evidence seems a little sketchy on what the confidentiality policy was. There's testimony that it wasn't in writing. There's controverted testimony, if you will, about an oral policy. The policy that seems agreed upon is that it was practice and policy not to release information about the audit until it was final. Having trouble finding anything that goes beyond that sense of confidentiality, there were citations, for example, to the staff discussions and the like about these documents being treated as confidential on a standalone basis, not just because it was before the final audit was released, but just somehow that they were inherently confidential. And there's also reference to the CPA regulations. Those seem to address client information. These weren't clients that the documents were coming from. I don't know. In other words, I'm not sure where's the support for the belief that they were clearly confidential. The communications coming from the outside to the city aren't inherently confidential. Maybe their contents would be if they're disclosing something under some kind of confidential privilege. I'm just having trouble finding where in the record does one find the support for the confidential policy as applied to these documents. As the Court pointed out, it is not a written policy, but a custom and practice within the Long Beach City Auditor's Office that all work documents pertaining to audits are to remain confidential pending the audit. Once the audit's been completed, been presented to the council in final form, then perhaps some of those documents may be released. However, there would have to be determination of whether or not there is further confidentiality based on whether or not they're exempt from the PRA. But any time you have to boil it down to the fact that the appellant was working on an audit for the city of Long Beach, and those documents that he was working with and the information that he had was not known to the general public, it was confidential, that's what the office policy is. The CPA guidelines and professional guidelines also indicate that you're not supposed to divulge client information. Now, the Court points out that while this information really isn't information about the city, it's about the phone companies, which may be true, but by the same token it also has information with regards to the citizens of the city and what they're paying. And I think ultimately there has to be an umbrella of confidentially with regards to the work product. Are there any other issues that you wish me to address? I don't believe so. Okay. Then I will thank the Court. Thank you. You may have a minute for rebuttal, Mr. Joseph Spurr. Thank you so much, Your Honor. Counsel, do you agree with opposing counsel that the California Court of Appeal addressed the probable cause issue? Yes. As I mentioned, in Hobbs I, they did address what would amount to probable cause but not for a felony. They only addressed probable cause for the misdemeanor of taking the paper. Hobbs I didn't analyze any further. They didn't need to. They didn't need to go any further and say, what's the value of this paper? So if there was any evidence of value, all you would need to have probable cause is Hobbs I plus a belief, a good-faith belief, that the value was greater than $400. Well, not exactly. The charge at that point wasn't a felony, so it wasn't even at issue. I know. I'm saying that to get probable cause for the felony, Hobbs I established that there was probable cause for the misdemeanor. And so the only difference is going to be whether that paper had a minimum value of $400. So to establish probable cause, you have to have Hobbs I plus some evidence that one could believe in good faith shows a value greater than $400. On these facts, that has to be my position. Okay. If I may, however, look at the good faith of that on the confidentiality of these documents. There could not be a good faith basis to believe that these documents and the only document, I say these documents, the only document was the AT&T document that could have been part of the audit. That was the only document. It's undisputed. Did that particular document about which there's no claim of confidentiality extrinsic to this policy that Mr. Squires testified to and Mr. Burroughs endorsed? See, I'm having trouble with that, counsel. I have trouble with somebody who's acting as an auditor and as an attorney and gets access to documents in the course of an audit and then turns around and, against the policy, in effect releases them before the final audit to say, well, they haven't established that they're confidential. That just is boggling to the mind that an auditor in a position of trust can turn around and use documents and say, well, they aren't stamped confidential. I can use them as an attorney to go out and file a lawsuit on them, which turns out undermining a negotiated settlement that seemed to be in the works. But it isn't. And he's fulfilling his role as an auditor in a public position. When does a monitor and an employee of a city have the right to go out and, as putting his lawyer's hat on in the furtherance of his auditing duties, file a lawsuit? Just as if he had put his public citizen hat on and went out and said, look, AT&T is trying to bamboozle the city. He's not a public citizen. He's an auditor with a duty of trust to the city. But as we point out in our briefs, an auditor has more than just an obligation to the client to do whatever the client wants. He's not a hired gun. He's a public auditor, he's a CPA, and he has a public duty to. . . But, you know, your whistleblowing claims were, which is sort of what you're saying right now, have been rejected by the California courts, and that's a matter of state law and a determination of fact that that's not what he was doing. Well, the court of appeal in that case expressly refused to reach the First Amendment issue. And so. . . No, but there was a whistleblower issue that. . . He was a whistleblower. And that was rejected. And that is aside from the fact that he was arrested, prosecuted, and served time. But getting money for yourself is a little bit different than expressing your view under the First Amendment. If there's a. . . You know, if you think that a public entity is doing something that's wrong and it's in the public interest to say it, it's one thing to write an editorial and it's another to make private use of that information for your own financial gain. And that's the allegation here. Civil rights lawyers do this all the time in Button. Yes, but they're not employed by the entity whose information they're using to obtain money. And I grant you that is a distinction, but a whistleblower would be. But he's not a whistleblower. I mean, that brings me back to where I started. And I didn't mean to try to circle back on that. A citizen is entitled to do this. Whether he had a contingency agreement on the Sanchez case or not, whether he stood to benefit financially or not, does not take away from the essential element of pointing out that the city of Los Angeles was engaged in unconstitutional tax assessments in two respects, tax on tax and unequal tax among the cell phone companies. But there was a comment about that it led to the end of negotiations with the consortium. The Sanchez lawsuit itself did that. Whether it did or not, I mean, that was just. Yes, Sanchez itself did that, not confidentiality. That had nothing to do with it. That's fine. And that's what they say. Counsel, you've exceeded your time. I've exceeded my time. If you have a sentence or so to wrap up, you're welcome to do that. I appreciate the extra time. And I just want to point out that a party asserting an exception to the Public Record Act nondisclosure has a heavy burden to show that public policy will be furthered by nondisclosure. The cities made no attempt to show that. They just say, we have a policy, and they claim, without any proof, that disclosure of these documents was problematic in any way. They showed an audit that any CPA would know is not generally accepted accounting principles in looking at the gross amount of wages that the city paid for a series of several audits to impose that value on the AT&T document or any of these documents because they didn't lose any of that value. Thank you, counsel. Not at all. Thank you, Your Honor. We appreciate the arguments of both counsel. They've been very helpful. And the case is submitted, and we will stand adjourned. Thank you so much, Your Honor.
judges: Graber, Fisher, Rawlinson